Good morning, Your Honors. May it please the Court. My name is Rick Stanley. I'm here representing Weyerhaeuser and also arguing for all of the plaintiff landowners. This case before the Court is unique and will have great significance on how the ESA can be used to burden unoccupied private lands with a critical habitat designation. It is a unique case because the lands at issue here are unoccupied, they're inaccessible to the species, and they're unsuitable for the species even if the species was introduced there. The lands will not support the species today and will not save it from extinction in the foreseeable future. In essence, these lands have been designated based on a hope and speculation that one day in the future, somehow, someway, they may come under control and be convertible back to habitat. We submit the ESA does not go that far, and if it does, it loses its footing in the Commerce Clause. In fact, we believe this case goes beyond the limits of the statute and the limits of the Constitution. There are a few __________________________________________________________________________________ The Federal Register says that all of this property is covered by timber lease until 2043, is that correct? Correct, for the next 28 years. The service is a few facts that are not in dispute but are important. The service's initial designation did not include Unit 1. The initial designation designated four units that were occupied by the species in Mississippi and seven additional unoccupied units in Mississippi that were adjacent to or contiguous with those other four, and those were all under active development to restore them to habitat so that the occupied could go into the unoccupied. Unit 1 was only added after criticism by third-party reviewers at the end of the day. Judge Feldman made the factual finding that every reviewer felt that you're disputing that fact finding with this? We would dispute that fact finding because we don't believe the service itself made that conclusion. In fact, we think the service was correct to pass over Unit 1 in its first two designations. It had already designated more than adequate land, I think in its view, to cover the frog, and the addition of Unit occur in Mississippi that could affect the population in the 11 designated units in Mississippi. So when he says every peer reviewer concluded the amount of habitat already proposed, which included occupied and unoccupied, was insufficient for conservation of a series of species, that you're contesting on appeal, that's a clear error of fact? Yes. Most importantly, Your Honors, and I think this is key, the service admits that it believes that these lands are only restorable to habitat. They are not habitat. They are not currently habitat. They are restorable, and it's on that basis that they ask that Unit 1 be designated. Now, to our knowledge, the service has never gone so far. We have looked. I have not been able to find any case where the service has said, well, just based on the restorability, and we don't have anything in the record to show that we can actually get there. But isn't that implicit in the distinction between occupied and unoccupied? That occupied land has to have the features that allow it to survive, but the fact that the statute doesn't have those requirements would suggest that you may have to adjust? I would disagree. In the cases that I've seen, Fisher v. Salazar is one. You're designating unoccupied habitat between two occupied habitats as a corridor. So that unoccupied does not have the features where the mouse needs to live, but it needs to cross over the unoccupied habitat, and that's a valid reason, even though it doesn't have all the PCEs on the unoccupied habitat. We also cited in our brief a case where unoccupied habitat was designated because it was feeding the habitat with resources and nutrients. Some contiguity required. Exactly. Some way I put it in terms of a supporting role. The land has to pay. It doesn't have to have the PCEs, but it has to at least play some supporting role to the species in order to be, quote, essential to the conservation of the species. And what's the statutory? I mean, I understand the logic of that, but what's the statutory or case law basis for that requirement? The statutory basis is simply the words, unoccupied lands may be designated if the original designation is inadequate and if it is essential to the conservation of the species. That's all we're told, and we're not given much to go on beyond that. And so we look to see how the courts have interpreted it, and there's not much law on it. I'll concede that. But the point is that essential has to mean something. So you say, not to me. Arboretum Bush is citing essentiality because they don't live there now. They couldn't live there without adjusting of it, and a current owner would not adjust it. Those three reasons make it... Well, and they can't get there, Your Honor. Frogs on their own, they can't hop there. Well, correct, and they can't be introduced without the landowner's permission. So that's the third thing. You're saying it couldn't be essential because they couldn't presently support it. You'd have to have the cooperation of the landowner. And it has to be restored, because even if you accept the finding, and we have to, it's in the record, that these ponds are still there. They have no frogs in them, but they're still there. The upland habitat is not suitable. The upland habitat would have to be restored. You'd have to introduce controlled burns. They currently have loblolly pine plantations instead of longleaf, so they don't have open canopy. They don't have the elements that a frog population would need to survive now, even if the frogs were to get there artificially or on their own. But they can't get there. And the reason we think this is contrary to law is going in the legislative history of the statute, trying to find out what does it mean to be essential to the conservation of the species. It was obvious that Congress thought this was a more extraordinary designation. In fact, Congress said, you can't designate all historical habitat as habitat. That's clear from the legislative history. And once you designate the occupied territory, you have to say it's inadequate to get to unoccupied territory. So the courts have said this is an extraordinary thing. And in Unit 1's case, it's beyond extraordinary because the frogs are not present. It's not contiguous or supporting any existing frog population. That reading of essentiality would mean the private property interest can always come. Because if the owner says you can't get on and I won't allow the frogs to come, then under your theory, you would never be able to designate that as critical habitat. I would say no, and I would disagree. And I think the government has made that point, and we don't agree with it. Regardless of whether we agree or not, if these lands were adjacent to a frog population in Mississippi and in some ways playing a supporting role or could play a supporting role by lending their ponds to that population, whether we agreed or disagreed wouldn't matter. The government could designate it. The whole point, their entire argument, and I guess the scientific basis that Judge Feldman elaborates, is that you don't want immediacy of location. The whole point is this is a sort of hurricane corridor. You could have a disease strike this one pond. And the essential attribute is to find an isolated ephemeral pond. Correct. And that's where we say it becomes limitless. It truly becomes limitless at that point. Well, it doesn't. You'd have to have the finding of essentiality, and it would have to be built on a finding of inadequacy. But there would be no lands that could not meet the restorability test, so long as one scientist or peer reviewer said, and the service agreed with them, that, yes, these lands would be useful at some point in the future. And there's also no temporal element to this. I made the point in the district court that, you know, there's no finding here whether in 28 years or 100 years these lands will ever become helpful or useful in any way to the frog, much less essential to the frog. And the judge said, well, you know, it might be 500 years before it happens. To me, that reads the notion of essential so. Is there any evidence that you offer, any scientific disagreement here in this record, that you offer to suggest that the current occupied unoccupied is adequate, number one? And, two, these particular little assembly of ponds aren't at all good and couldn't be restored. Is there anything in the record Judge Feldman had disagreeing with the consensus he thought? I think you can only argue inferentially. And the inference would be had the service went through seven years after designating this species, went through and did a first pass and did not include Unit 1, didn't look to Unit 1, then went through and expanded it and did a second pass after looking at all the science. And only after a group of peer reviewers said, we think it would be very, I don't want to make it trite, but we think it would be neat to have this standby habitat over here in Louisiana, just in case something happens here. Well, that's an inferential point. I can't argue with it. It's in the record. And Judge Feldman said, well, there it is. But never before have we seen it go to this potentially restorable standby habitat that is noncontiguous and inaccessible to the species. We just haven't found that anywhere. So we believe, in essence, Your Honors, that what has happened here, it's become easier to designate unoccupied lands than occupied lands. Occupied lands, it's tough. You've got to find all the PCEs. Unoccupied lands, all you need is an argument that the lands may be restorable at some point in the distant future. Our second point is that even if Unit 1 could have been designated, the service should have, was arbitrary and unreasonable not to exclude it based on the disproportionate economic impact. Now, we think it's pretty clear that there is disproportionate impact. Virtually all of the economic impact falls on Unit 1 versus benefits. The service really can't point to any benefit to the frog. The designation of Unit 1 is not going to hurt or harm any frog in the foreseeable future. The argument really is that this Court can't review it. And I believe that's incorrect. I think Judge Feldman reviewed it. And we think under Heckler v. Cheney, when an agency acts in a way that affects private property, it's certainly subject to judicial review. The agency did do the economic analysis. They come up with the three hypotheticals. Correct. And then they chose not to exclude, which the second sentence would have required them. But here, by including it, their argument is you don't have any reviewability. Correct. You're saying we can review it, but what's the law we would apply? How would we assess what's this disproportionality test? We would look at non-impact for the pond they made didn't cost much, whereas this would be as much as $33 million but as little as zero. I think it's as simple as taking the test that you would apply. Obviously, I mean, the government concedes if they decide to exclude it. That's reviewable. Yes. And they say that you would review us to see if we correctly looked at the cost to the landowner versus the benefit to the species. We simply suggest the standard is the exact reverse. Right, but they did look at the cost to the landowner. They did, and statutorily, the first part of the statute says shall, and then the second part says may. And two district courts have said that makes it unreviewable. Let's assume you're right, though, in reviewing it. If they said right now it's a zero cost, and for the foreseeable future under the current lease it will be zero, there would be no in your agency because there's no federal nexus. Well, that would be contrary to the record, because the record says there's three potential ways to measure the cost. One is zero. One is $20 million. One is $30 million. Presently, is there any federal nexus, present use? According to the government, no. But there is the rules in effect as we speak. If the landowners were to seek to develop part of it and it was deemed wetlands, then you would have a Section 7 consultation. But as we sit here now, the government says, hey, if you keep using it for a timber lease, you have no federal nexus, so you don't have to come to us. But that may not be the rule tomorrow or the next day, and it does, of course, freeze the land out of development. I think the Commerce Clause point is made in our brief. Finally, we would ---- Why would GDF Realty? I think GDF Realty helps us. It doesn't hurt us. And here's why. I think read carefully, this court searched for the Commerce Clause nexus and rejected several offerings for Commerce Clause nexus and only saved the take portion of the statute by saying extinction of a species. Now, that we see can affect interstate commerce. We have no take. This is not the take provision, and this is not going to lead to the extinction of the species. We're not talking about these six cave species going extinct. We're talking about lands being removed that the service didn't even designate in the first instance. So since there is no nexus to any extinction, we think that even GDF would say Commerce Clause footing is lost. I'm going to save the remainder of my time for rebuttal. Thank you. May it please the Court, I am David Shilton, representing the U.S. Fish and Wildlife Service. I'll be sharing five minutes of my time with Intervenor Center for Biological Diversity. The landowner's arguments this morning, I think, overlook a couple of important things. One is the definition that Congress provided for the word conserving. And it said, this is in Section 1532, the definition section of the statute, it said that conservation and conserving means to use all methods and procedures which are necessary to bring any endangered species to the point at which the measures provided are no longer necessary. And then it goes on to say such methods and procedures include, but are not limited to, and then it has a list, and among those are habitat maintenance and transplantation. So Congress specifically contemplated that transplantation is something that could be used to conserve the species. And the other relevant thing is that- Isn't there a different section that addresses transplantation? In there, I thought there was a separate, not just designating as critical habitat, but if you want a transplantation, I thought there was a different section of the statute that dealt with that. Well, the Section 9 dealing with takings, you would need to get a permission to do something like that, and the Fish and Wildlife Service itself has authority to transplant. But what the Fish and Wildlife Service does here is simply designate what lands are essential, what unoccupied habitat is essential for the conservation of the species. And here it found that Unit 1 was essential, based on especially the input of these peer reviewers- You have no statutory authority to transplant a frog onto Unit 1? No. While it's private land, we could not. It requires their permission. Nonetheless, the habitat there contains these unique ponds which are extremely rare, but vital for the ultimate preservation of this species. These frogs need ephemeral ponds, which are only containing water for part of the year, and then dry up so that fish can't get in, which would prey on them. And no one has identified any other property which has a complex of ponds, five ponds here, in near enough proximity to one another that if a couple of the ponds lost frogs because of drought, they could be repopulated from the other ones. What would have to be done to restore the uplands? They would need to be returned to a more natural forest regime. They would probably need some controlled fire to open it up somewhat, so there would be more sunlight coming in. Right now it's a pretty dense overstory, and that shades out the herbaceous growth that the prey that the frog would need. So that sort of management is well known. Would the existing ponds have to be removed? Some of them would, but that sort of management effort is now going on for some of the sites in Mississippi. It's not difficult to do. And you would replant a different tree in place of the ponds? Likely so, slash pine rather than the loblolly. So there would need to be some of the efforts which Congress contemplated here, and you would need the cooperation of the landowners. But as the Fish and Wildlife Service pointed out in the Federal Register, it has tools for bringing about cooperation, encouraging cooperation. You can't tell them you can't do anything else with your property? Well, if the landowners need a federal permit, say from the Corps of Engineers, then in that case the Corps of Engineers would have to consult with the Fish and Wildlife Service over whether what is proposed would adversely modify the critical habitat. And the Fish and Wildlife Service, if it found that it would adversely modify, would come up with reasonable and prudent alternatives, which would have to be technically feasible. And those might require the landowner. Could they develop the property, any of the property at all? Yes, yes, they certainly can develop any property which is not jurisdictional waters of the United States. That's really about the only federal hook that's been suggested here. I'm saying given the designation of Unit 1 as critical habitat, what development could occur? What is feasible in light of that designation? Well, development that was on the uplands, which left enough of the proper type of forest to support the frog. How much of it could be developed? Well, it's very hard to say, and that's in the economic analysis that was done here. That's why they had to do different scenarios. In one scenario, they said, well, the Fish and Wildlife Service might allow development on 40% of the designated area and say that the other 60% was needed to prevent adverse modification. If Fish and Wildlife does that and says that's reasonable and prudent, can the landowner challenge that as unreasonable? Yes. The landowner can challenge that. At that time, they would presumably sue the Corps and the Fish and Wildlife Service and say that these restrictions are unreasonable. We've seen suits like that. Is it odd that there are more restrictions on occupied, this point about how you would have to actually prove more to get designated occupied land than you would as to unoccupied land? You don't have to prove the current viability of the unoccupied land? Well, I guess I'm not quite understanding the question. I'm sorry. Well, maybe the question is this. I think their concern, as I understand the record, is that all these reviewers say we need an expanded sort of contiguous area, and then one reviewer says, oh, well, let's look historically and we'll find this isolated. And then that kicks in, this one observation. And then there's a consensus. That's a good spot. But it doesn't have the current features that would allow for occupied frogs. I guess here's the question. What's the limit on the rule you're urging us? Because is it just inadequacy of occupied plus essentialness? Those are the limits. But essential to the conservation of the species is a real limit. And also the inadequacy is. But we interpret conservation in Sierra Club to be pretty broad. It's not survival. It's just eventually getting it to not even be in danger. So you can take it off the list. True. But that seems pretty comprehensive then. What unoccupied land that was once part of the range wouldn't be able to be designated? Well, again, only if the occupied is not adequate, which is usually the case. It's not many cases that they find that they need to go to unoccupied. But to find that it's essential, it's likely to have some unique characteristic, like this land does, these unique ponds. But it's currently the trees growing out there. It's currently existing. It's not essential because it's not occupiable. Well, it qualifies as essential because it certainly has the potential to be. Potential. A lot of land has potential. This land cannot support the frog, cannot be a habitat as it currently exists. As it currently exists, with the trees the way they are, I think it would be difficult to have a long-term survival. That's where it's hard for me to see how it can be essential to the survival of the frog. Because the. You have to modify it. Right. And the statute allows modification. No, it does not. Not without the landowner's consent. Well, true, but many landowners voluntarily do this. They have said no. That's their position. So you don't have the authority to modify the land. So it can't support the frog. But I think it has to be an objective sort of test, and that the particular landowners. Essential to me seems even more of an emphatic term than necessary. Congress chose the word essential. Not necessary. Not feasible. Not potentially feasible. Not desirable. They said essential. Well, Congress said essential and said that that determination should be made after consideration of the best available scientific information and a consideration of economic impacts. But it didn't say you've got to consider the present plans of the landowner and whether the landowner objects to translocation. Well, the point is it can never become suitable habitat without the permission of the owner. So I don't see how it could ever be essential. Well, certainly it could become if the landowners do need federal permission. Right. That's correct. Assuming the landowner says no, how can it ever become habitat? Well, these landowners may decide that it's in their economic interest. So on the current record, it cannot in the foreseeable future become habitat. Certainly as of today, it can't. But I think in the foreseeable future it was reasonable for the service to assume that the landowners might decide that it's in their- Well, why don't you weigh in designated as essential once the landowners agree if they do? Well, Congress wanted critical habitat to be designated right away. Okay, but Congress wanted habitat that's critical, that can be used by the frog. And it doesn't support anything? I think that's a scientific question, and the scientists here said it's critical to have some habitat that's not right in this core in Mississippi, that you need someplace far enough away so if there's a catastrophic drought or something- That can be modified if it needs to be modified. And you can't modify it without the owner's consent. So I don't see how you fit within the statute. So I think essential just doesn't imply that it's in move-in condition now and that you can use it right away. I think the whole statute looks in the long term, that recovery is a long-term process, and so landowners' desires and plans can change. And so the service, looking at it- Did you build a pond elsewhere? Yes, there's been an attempt to build a pond on some Forest Service land. They've been working on it for some 20 years. Falls weren't there, so that was unoccupied land that wasn't ready to take them because there was no pond at all. But they designated and built a pond. The distinction there, perhaps, though, is that's Forest Service land, so it then reduces to whether or not it's essential to have cooperation. You can't have essentiality unless an owner cooperates. That seems to be what it's coming down to, but I think the statute does not put owner cooperation as a factor that's determinative. Well, I mean, it seems like it does. If you want the property bad enough, you can take it under the eminent domain, condemn it, take it. True, but- If you want to make it essential, if you want to make it habitable, you just pay for it and take it. Then you can give the permission or get somebody to buy it who will give you the permission. But I think the purpose of the statute is really to inform federal agencies of where critical habitat is, and so that's a scientific question. If the scientists all agree that sitting there today with no modifications is critical habitat, I think you would have a different case, but that's not what we have. But I think if the scientists agree that it's critical, even with some modifications, that that would be essential. With this frog, there simply isn't unoccupied habitat that has all of the features you would need without modification. It would essentially be saying that this frog is stuck in this one place where it's very threatened with extinction, and I think that's not consistent with Congress's purpose to conserve and bring about taking these species off the list by recovery. If you're writing your argument as to the essential, that it can't turn on whether an owner just says yes or no, but where do the private property interests kick in statutorily? I would have said they kicked in at the economic analysis stage. I say that just having looked at some of these cases. Do you remember the spotted owl case in Arizona? Yes. Okay. In that case, the tribe didn't want to sell the land, as I understand it. They were excluded because there were dialogue going on. That was upheld as an element for exclusion. So this landowner's opposition would be the basis for exclusion, but it didn't happen. Is that a fair way to read the law? A basis for exclusion would be a disproportionate economic impact. Or even a basis, as I thought in that case, say where we've got a dialogue. This gentleman who owns the land or the tribe, we don't want to actually seize their land. We don't want to seize the tribe's land and pay them for it, and they lose it. But we've got a dialogue with them. We're hoping it will lead to species survival. And the court in that case said that's actually a reason to exclude altogether. No habitat, provided the dialogue exists. Is what happened here that there simply never was any dialogue? There was dialogue in the sense that the landowners commented on this, and they stated their preferences to not have frogs. But the statute says that the secretary may exclude, and it gives that discretion. But given the benefit of this property to the species, given the unique nature of these five ponds, which just aren't found anywhere else, I think it was rational for the service to find that this was just too important to not designate, despite the fact that the current landowners don't want transplantation. And so it did not have to exclude. And as the cases that have looked at this so far have said, the statute doesn't give us any meaningful factors to judge such a determination. And even if it is reviewable, as the district court here found, it's reviewable under a deferential standard. Now let me take a little more time and charge it to me. As I see it, I don't see the economic disparity analysis when the owners are definitely known to object to any change or modification of their land. So that push comes to serve legal powers here really goes back to the wetlands and the cores say so. Of course, the core is going to talk to wildlife in making its decision. But if they can get over any wetland problem for development, they will be able to develop. And what we've got here, this order here, is not going to stand in the way per se. Correct. Am I wrong? No, you're correct. The economic impact is all very hypothetical and in the future because it all depends on what happens when some sort of federal agency permission is needed. And so the cost may be zero if they never need a federal permission. And that's one of the reasons why the Fish and Wildlife Service said this is not disproportionate because the cost may never accrue. I thought the statute said explicitly that once designated as critical habitat, the federal government, any arm of the federal government, cannot authorize any program that would change or diminish or take away or whatever. I mean, the government would have to back off. They would have to de-designate some of this, wouldn't they, to allow development? The Fish and Wildlife Service would have to de-designate it. Well, it might find that the particular type of development that's proposed does not reach the definition of adverse modification. And to be an adverse modification of critical habitat, it needs to have some substantial impact on the recovery of the species. So it might find that or it might find that with some changes. But that would be all up to the Fish and Wildlife Service, not the landowner. Well, often the Fish and Wildlife Service and the landowner cooperate at that stage and come up with a habitat conservation plan that allows some development to go forward but still doesn't adversely modify. So we don't know what kind of cooperation might occur at that future stage. Sometimes there is no meeting of the minds and there's a lawsuit. But all of that is in the future. But I think the benefits of this land to the species where, again, they are contingent on certain things happening, but it's such unique land that the Fish and Wildlife Service was not arbitrary and capricious to find that there was a benefit that outweighed any cost. I don't want to take more time of my intervener colleague than I have already done. Thank you. May it please the Court, I'm Collette Adkins, and I represent the intervening environmental groups. Essentially what their argument is is that because they don't want to restore the land, because they don't want to allow frogs to be reintroduced, it can't be essential. But we've got to remember that if the Fish and Wildlife Service finds it essential, they must designate. And here they didn't propose to designate those lands in Louisiana to begin with. They just did the Mississippi lands. And as required, they put that out to the experts on the frog, and every single peer reviewer said that the land just in Mississippi isn't enough. And I've got quotes from the administrative record on page four of my briefing, that footnote there. Every one says, oh, that land in Mississippi is a promising site for reintroduction. It's truly essential. Without other breeding ponds, the frog survival is challenged. We need to decrease the risk of extinction by having this extra one. We've got very little time. That record exists. What about Judge Owens' questions? I'm curious to your answer. Could property never be deemed essential unoccupied if the landowner will refuse the entry to make the modification? Yes, and I remember you saying, too, Judge Higginson, that, well, I get your logic that the frog isn't going to benefit here, so it's not going to be essential. I don't agree with that logic. I think water is no less essential to human life even if you're dying of dehydration. This land is essential for the frog. The expert said it will not survive and recover unless it has a separate set of land here. So it is essential. The scientists found it. It doesn't matter if the frog can't benefit from it. Of course, it's a tragedy that these landowners won't. Let's be absurd. Let's say you had a perfect lunar hole that would be perfect then, but no one could ever get them there. You wouldn't be able to designate that as essential if it were impossible to ever get them there. Well, here, you know, the opposing council makes much that this is an extraordinary circumstance, that they can't find their situation where land that's not adjacent has been designated before. But this is an extraordinary circumstance. There's less than 100 of these frogs that remain. Why doesn't the government buy it outright? Excuse me? Why does not the government buy it outright? They may, you know, and we don't know that. If it's essential, why don't they pay their landowner and buy it? You know, in Mississippi, we worked with a developer there that had land adjacent to its development, and the developer wanted to put forth its development as a green development. And they ultimately agreed to not develop that land, to keep it in a preserved state, and ultimately did find a buyer through a land trust. And, I mean, plus, as your point, Judge Owen, this is under a lease until 2043 for timber, and they will never have to interact with the government on a timber lease. They can continue to use the land as they have been. Unless the timber people decide that they can offer to sell their lease back to the landowner and share in some of the commercial development. We can't treat that lease as immutable either. That's right. Yep, the land ownership might change hands. The lease might. That's right. The Fish and Wildlife Service doesn't know what's going to happen in the future. What they know is what the science says now. And what the landowner says now, which is no frog. You know, in reality, though, if on this record, where every peer reviewer said that more land was required for designation, if the Fish and Wildlife Service wouldn't have done it, they would have faced a lawsuit from us, the environmental groups, for not following the science here and the law that says that if the land is required for the survival and recovery, they must designate it. And that's exactly what the agency did here. And let me just say one more thing here. I mean, they do talk about it being, they want to make it sound like there's a requirement that in the future, that we know that for sure the frog is going to be able to benefit from it. But I really want you to focus, please, on the language of the statute, that if the Fish and Wildlife Service finds that it is essential, it must designate it as critical habitat. What does essential mean to you? Essential means essential for the survival and the recovery. And for that, to answer that question, you look at what the scientists say and you look at the documents in the record, and they can't point to a single document in the record. There's not a single one. All the peer reviewers were unanimous that this land was required for the survival and recovery of the frog. All right. So you say that our only decision is whether we maybe are as reluctant as the trial judge was, but we say the designation has been approved and we have to affirm, and that's as far as we go. And after this, the problem of whether they get to modify the land and whether the frogs ever get there and what they can do with the wetlands problem and the core, that's for the future. All we've got here is the designation they're required to make, and they've made it, and it's justified by the expert support, period. That's exactly right. And if there is later on a biological opinion where the Fish and Wildlife Service assesses whether it could be developed or not, they could come back to court and challenge that, if the Fish and Wildlife Service says that no development is possible. I see my time is up. Thank you. Briefly in rebuttal, Your Honor, before you can put what I'll call the franchise tag on these unoccupied lands and set them off and say you're now restricted unless you consult with the government on these wetlands, essential, you have to find it to be essential. And essential has to mean, I think, I submit, it has to mean that there's some tangible benefit to the species, some articulable, tangible benefit. As we have, I think, clearly, and I think as the government has conceded, unless this property is restored, unless it's modified, unless the government can come on and do things to the property, it's not going to have any tangible benefit to the species. It is a theoretical potential habitat in the future, and that seems to be outside of the ordinary meaning of the word essential. As to Judge Rieveley's question, and I think Judge Owen's question, about what is feasible development on these lands without government interference, I was struck by reading the GDF Realty case at how that landowner tried everything in his power to cooperate with the government and ultimately was denied, denied, and denied. And sometimes denied and not even told he was denied. It is, as a practical matter in the cases of Legion, it is very difficult once the franchise tag is put on the land to get out from under it. It is very difficult to develop it. It immediately diminishes the value of the land because no purchaser wants to have anything to do with it. As to the frogs being stuck in one place, I heard that. We submitted a map in our brief for that very reason, to show that the frogs have a pretty wide range. I mean, when the service went back and redesignated the original 11 units, they designated thousands of acres for these frogs. So the frogs have quite a bit of land to expand into without Unit 1. The only question is whether this theoretical future habitat can be preserved, can be set aside under a theory offered by these biologists. We submit in conclusion that there's no circuit that we've been able to find that has interpreted the ESA this broadly. None have said a non-contiguous, unoccupied, inaccessible lands, similar to Unit 1 on these facts. And it is perhaps unique. It may be a case all by itself. But on these facts, no court has said the ESA gives the service that authority. And we frankly believe this is a finding new authority in an old statute that the Supreme Court has told us to be wary of. When an agency comes forward and looks at an old statute and says, well, now the essential to the conservation of the species means it doesn't have to have any tangible benefit. It doesn't have to be foreseeable. We don't have to articulate how a single frog would be helped or hurt by this designation. We think that simply goes too far. And I would ask the court to reverse and exclude Unit 1 from the rule. Thank you.